**FILED**
**CLERK**

6/10/2013 1:52 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------X
MOOSA EBRAHIMIAN AND SHEILA
EBRAHIMIAN,

               Plaintiffs,            **MEMORANDUM OF**
                                         **DECISION AND ORDER**
       -against-                 **11-CV-04136 (ADS)(AKT)**

NATIONWIDE MUTUAL FIRE INSURANCE
COMPANY,

               Defendant.
---------------------------------------------------------X
**APPEARANCES:**

**Jonathan E. Kroll & Associates, PLLC**
*Attorneys for the Plaintiffs*
400 Garden City Plaza
Garden City, NY 11530
   By:  Jonathan E. Kroll, Esq., Of Counsel

**Stalker Vogrin Bracken & Frimet LLP**
*Attorneys for the Defendant*
150 Broadway
Suite 1200
New York, NY 10038
   By:  Thomas J. Bracken, Esq., of Counsel

**SPATT, District Judge**.

On July 22, 2011, the Plaintiffs Moosa Ebrahamian and Sheila Ebrahimian filed this

action against the Defendant insurer Nationwide Mutual Fire Insurance Company in New York

State Supreme Court, Nassau County. The complaint relates to an insurance policy which the

Plaintiffs allege the Defendant breached by disclaiming certain coverage for damage sustained

by the Plaintiffs' residence due to a severe storm. The Plaintiffs seek declaratory relief as to the

parties' rights and obligations under the insurance policy as well as special damages and punitive

damages arising out of the Defendant's alleged bad faith disclaimer of coverage. On August 25,

2011, the Defendant removed this action to this Court pursuant to 28 U.S.C. § 1441 on the basis

of diversity of citizenship jurisdiction. Presently pending before the Court is the Defendant's

motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56

dismissing the complaint in its entirety. For the following reasons, the motion for summary

judgment is granted in part and denied in part.

# I. BACKGROUND

## A. **Factual Background**

Unless otherwise stated, the following facts are drawn from the parties' Rule 56.1

statements and are undisputed.

The Plaintiffs are a married couple who own the premises located at 7 Birchwood Lane in

Kings Point, New York. The Defendant is a company incorporated in Ohio with its principal

place of business in Iowa. On or about July 5, 1995, the Defendant issued a homeowners policy

under the number 66 31 HO 095769 ("the Policy") to Plaintiffs in the amount of $1,486,000.

According to the Defendant, the Plaintiffs' son Robert procured the policy. The Plaintiffs

concede that neither of them played a role in the purchase of the policy, and that neither ever saw

or read of the policy. The Policy was renewed for the term of July 5, 2009 through July 5, 2010.

The Policy contains the following pertinent provisions:

> **Coverage Agreements**
>
> **COVERAGE A – DWELLING**
>
> We cover:
>
> 1. the dwelling on the residence premises used mainly as your
> private residence, including attached structures and attached wall to-
> wall carpeting.
>
> . . .

(The Policy, at B2).  The policy also contains the following provision as to Additional Living

Expenses

### COVERAGE D – LOSS OF USE

We cover, subject to the coverage limit which is the total limit, all of
the following:

1. **Additional Living Expense**.  If a covered loss requires you to
leave the residence premises, we will pay the required increase in
living expenses you incur to maintain your normal standard of living.
Payment will be for the shortest time required to repair or replace
the premises; or, if you permanently relocate, for the shortest time
required for your household to settle elsewhere.  Payment will not
exceed the limit of liability shown on the Declarations or 12 months,
whichever occurs first.  This period of time is not limited by the end
of the policy period

. . .

(Id. at B3).  In short, Additional Living Expenses are only payable for the "increase" over normal

expenses.  Further, the policy contains the following pertinent exclusion:

1. We do not cover loss to any property resulting directly or indirectly
from any of the following.  . . .

. . .

(h)  Ordinance or Law, meaning enforcement of any ordinance or law
regulating the construction, repair or demolition of a building or other
structure.

. . .

(Id. at D1).  The policy also excludes damages resulting from "birds, vermin, rodents, insects or

domestic animals."  (Id. at D2).  In addition, the policy contains the following terms and

conditions:

3. **Your Duties after Loss**.  In case of loss, you must:

a) give immediate notice to us or our agent; and also to the
police in case of theft.  In case of loss under the credit card

coverage, also notify the credit card (Electronic Fund Transfer Card) company.  If loss is caused by or results from the peril of hail, loss must be reported to us or our agent within 6 months of the loss event.

b) Protect from further damage. You must make repairs required to protect the property and keep a record of repair expenses.

c) As often as we reasonably require:

(1) show us the damaged property; and

(2) provide records and documents we request and permit us to make copies.

(3) submit to examinations under oath and sign same.  At your or our request, the exams will be conducted separately and not in the presence of any other persons except legal representation.

d) submit to us, within 60 days after we request, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief:

(1) the time and cause of loss.

(2) interest of the insured and all others in the property involved and all liens on the property.

(3) other insurance that may cover the loss.

(4) changes in title or occupancy of the property during the term of the policy.

(5) specifications of any damaged property and detailed estimates for repair of damage.

(6) a list of damaged personal property showing in detail the quantity, description, actual cash value, and amount of loss.  Attach all bills and receipts that support the figures.

(7) receipts for additional living expenses and records supporting the fair rental value loss.

(8) evidence or affidavit supporting a claim under the

> Credit Card, Electronic Fund Transfer Card, Access
> Device and Forgery Coverage.  It should state the
> amount and cause of loss.

(Id. at E1).  Finally, the policy requires that a waiver or change in its terms "must be in writing to

[the Defendant] to be valid." (Id. at L1).

On June 24, 2010, a storm damaged the Plaintiffs' home and personal property.  In

particular, the storm damaged the "bedroom wing" of the house. The Defendant subsequently

assigned one of its employees, Paul Maggio, to adjust the Plaintiffs' claim (Maggio Decl ¶ 2).

According to Maggio, "[l]arge tree limbs hit the home at two locations due to heavy winds and

caused damages to include residual interior water damages" (Id. ¶ 4).  The Plaintiffs claim that

the damages to the residence included the "second floor master bedroom, rear left bedroom, four

bathrooms, hallway, stairway, front hallway, first floor office and exercise room" (Sheila

Ebrahimian Decl, at ¶ 5).

Maggio inspected the premises and met with the Plaintiffs' son, Steven.  On July 21,

2010, Maggio sent the Defendant an itemized estimate, containing the valuation of damages for

the reported loss, the net claim being $73,64,554.

The estimate was later forwarded to the Plaintiffs.   The estimate stated:

Dear Valued Customer,

Please refer to the enclosed itemized estimate. This estimate contains our
evaluation of the damages for the reported loss and was prepared using reasonable
and customary prices for your geographic area. If this document contains
estimated structural repairs, and you choose to hire a contractor, please provide
this estimate to them.

If any hidden, or additional damage, and or/damaged items, are discovered, please
contact me or have your contractor or vendor contact me immediately.  Coverage
for the hidden or additional damages and/or damaged items, would need to be
determined, and may require any of the hidden, or additional damages, and/or
damaged items, until we have had an opportunity to review the hidden or
additional damages and/or damaged items, and have reached an agreement with

> you on any supplemental cost. If you, your contractor, or vendor determine that
> there are additional building fees and/or permits associated with the estimated
> repairs, that may not be included in this estimate, please contact me immediately
> so that I may review and make a determination as to the appropriate payment.

(Def's Exh D). According to Maggio, "the estimate took into consideration all observable damages to areas due to the impact of the tree on the house, including the second floor master bedroom, the rear left bedroom, one bathroom, the hallway, stairway, front hallway and first floor office and exercise room" and accounted for "damages relating to insulation, electrical, content manipulation, framing, carpentry and trimwork as a result of the storm" (Maggio Decl, at ¶ 8, 9). Maggio stated that "[t]here were neither extensive plumbing nor electrical damages to the home that resulted from the June 24, 2010 storm" (Id. ¶ 18).

Upon receiving the estimate, Mrs. Ebrahimian did not speak with anyone, including Maggio or anybody in her family, about it. The Plaintiffs subsequently retained the services of Edge Remodeling to perform the construction on the home.

Mrs. Ebrahimian stated that when she received the estimate, she did not provide it to the contractor. She testified as follows: "You know, what was I going to show it to him? Say 'these are the prices our insurance company thinks you should charge?' (Sheila Ibrahimian Dep, at 109-110).

On July 29, 2010, the Defendant provided the Plaintiffs with a proof of loss form. The Plaintiffs signed, notarized, and returned the form to the Defendant. Thereafter, Edge Remodeling began construction on the house. Payments to Edge Remodeling were not based on any type of written estimate or agreement for a set amount. Subsequently, Edge Remodeling wrote a contract for labor and building materials for about $30,000-$33,000. Edge Remodeling was paid approximately $100,000. Edge Remodeling charged $1,200 per day, with four workers

getting paid $200 per day. The Defendant claims that neither the Plaintiffs, their counsel, nor the contractor ever contacted the Defendant to dispute the price allocated to any of the repairs or replacements.

According to the Plaintiffs, from June 24, 2010 until December 20, 2010 with the exception of one week, they spent $875.00 per week to feed themselves and their two children, totaling approximately $21,000. The Plaintiffs' sons stayed at the premises for virtually the entire six months after the loss except for two or three days after the storm they stayed at a hotel, while their parents lived at a hotel. The Plaintiffs aver that "the children could have stayed at the hotel with [her] husband and [she,] they chose not to because it was not safe to leave the residence unattended and they returned to secure the residence and to prevent looting" (Sheila Ebrahamian Decl, at ¶ 9). The Plaintiffs' sons did not keep food receipts for the time during which they lived in the home.

The Plaintiffs claim that in or about August 2010, Maggio told Mrs. Ebrahamian "that due to the fact that [Mr. Ebrahamian], two children and [her] were forced to eat out all the time due to the damage that occurred to our residence, that [they] should average what it would cost [them] to eat and that [the Plaintiffs] would be reimbursed for that amount" (Id. ¶10). Mrs. Ebrahimian arrived at a figure of $125.00 per day and Maggio used $125.00 as the normal prior to loss living expense for food in calculating the receipts received. Mrs. Ebrahimian was questioned, "So is it safe to say [Maggio] is asking you what you were spending before the loss of food, is that correct?" and Mrs. Ebrahimian answered, "Yes." (Sheila Ebrahamian Dep, at 192). Maggio accumulated the receipts he received in the amount more than $3,000.00 and then paid the amount over the $125.00 per week in coming to the incurred expenses as the "required

increase." In discovery, the Plaintiffs turned over approximately $6,000 in food receipts. The parties have resolved the Additional Living Expenses related to the Plaintiffs' stay at the hotel.

On November 17, 2010, Maggio sent a letter to the Plaintiffs stating:

> As discussed during our meeting on November 12, 2010, please submit copies of incurred expenses (receipts) for food during your stay at the hotel
>
> In addition please submit a detailed list of damaged personal property for review and possible reinspection of claimed items.

(Def's Exh R).

In January 2011, Mr. Ebrahimian sent a letter to Maggio's supervisor, Joseph Bunk, which stated:

> I am writing to you regarding the claim on our house. Until now, Nationwide Insurance has ignored our numerous requests for a check on account to cover expenses we have incurred in the repairing the damages we suffered in our home. I have included in this letter a list of checks that we wrote related to our claim. . . .
>
> Nationwide has only been sending us small checks and has been delaying reimbursements for the larger expenses we have incurred. We will hold Nationwide responsible for the interest we are paying for the amount we had to put in. . . .
>
> If we do not receive a check from you by January 29, 2011 we have no choice but to give this matter to our attorney.

(Plf's Exh F).

On March 7, 2011, the Plaintiffs' counsel sent a letter to Maggio stating:

> Over the last several months my clients have attempted to obtain payment for the damages done to the house under the policy of insurance they maintain with your company. I am informed by my clients that the insurance company has refused to make full reimbursement for moneys expended in connection with the repair work done to the aforementioned property.

(Plf's Exh J). About this time, the Plaintiffs also allege that their counsel, Jonathan Kroll, met with Maggio and discussed the Plaintiffs' dissatisfaction with Nationwide's price

allocated to various components of the construction job, Additional Living Expenses, and other items.

In response, the Defendant claims that the Plaintiffs submitted invoices for materials used in connection with additional work beyond the scope of the insurance claim. Specifically, the Defendant asserts that certain work done to the bathrooms, insulation, lighting fixtures, shower doors, and toilets had no demonstrable connection to the storm damage. In response, the Plaintiffs contend that these repairs were necessary to bring the property into compliance with building code specifications and were not beyond the scope of the claim.

However, when asked about the toilets damaged in the storm, Mrs. Ibrahamian stated that "[t]hey may not have been broken physically, but because everything was doing to be done, they . . . just broke everything up" (Mrs. Ibrahamian Dep, at 170-171). As to why the sinks were renovated, Mrs. Ebrahimian was asked: "So you don't know if the sinks were damaged one way or the other?" and the answer was "No." (Id. at 172).

The Plaintiffs also seek damages related to the furniture in the master bedroom. The Plaintiffs assert that the furniture is unrepairable. The Plaintiffs admit that they have not had anyone inspect the furniture and/or appraise the damages. The Plaintiffs insist that, even if the furniture were repairable, the pieces of furniture were so large that they had yet to find someone willing to remove them from the home. The Plaintiffs also aver that their counsel corresponded with the Defendant's counsel about how to proceed regarding repairing the furniture but has not received a response.

On May 13, 2011, the Plaintiffs son, Robert, informed the Defendant that mice were entering the home. The Plaintiffs claim that the vermin resulted from the

Defendant's vendors negligence in improperly and incorrectly placing a tarp on the roof

the residence.  On May 16, 2011, the Defendant informed the Plaintiffs that their claim

for damages relating to the vermin was not covered by the Policy.

## B.  Procedural History

On July 22, 2011, the Plaintiffs filed suit in the Supreme Court of the State of New York,

Nassau County, alleging breach of contract and bad faith for failing to indemnify the Plaintiffs

under the Policy.  In particular, the Plaintiffs allege that the Defendant owes them $159,007.86 in

unreimbursed expenses.  The Plaintiffs claim that the Defendant has previously indemnified

them in the amount of $123,785.00.  On the other hand, the Defendant claims that it has paid

$170,317.53, including $112,675.57 for the dwelling, $15,871.64 for contents, $41,270.32 for

Additional Living Expenses and $500 for Live Tree Debris Removal.  The Plaintiffs also allege

that the Defendant owes them in excess of $21,000 for Additional Living Expenses regarding the

food.

On August 25, 2011, the Defendant removed this case to this Court on the basis of diversity

jurisdiction.  The Defendant subsequently moved for summary judgment pursuant to Fed. R. Civ.

P. 56 dismissing the complaint in its entirety.  That motion is currently pending before the Court.

## III. DISCUSSION

## A. Legal Standard

It is well-established that, when deciding a motion for summary judgment pursuant to

Fed. R. Civ.P. 56(c), the Court may not grant such a motion unless "the pleadings, depositions,

answers to interrogatories, and admissions on file, together with affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(c); Globecon Group, LLC v. Hartford Fire Ins. Co., 434

F.3d 165, 170 (2d Cir. 2006). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Paone v. Microsoft Corp.</u>, 881 F. Supp. 2d 386, 393 (E.D.N.Y. 2012) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." <u>Cronin v. Aetna Life Ins. Co.</u>, 46 F.3d 196, 202 (2d Cir. 1995) (citing <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962) (per curiam), and <u>Ramseur v. Chase Manhattan Bank</u>, 865 F.2d 460, 465 (2d Cir. 1989)).

If the moving party meets its initial burden of demonstrating the absence of a disputed issue of material fact, the burden shifts to the nonmoving party to present "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). The nonmoving party may not then rely solely on "conclusory allegations or unsubstantiated speculation" in order to defeat a motion for summary judgment. <u>Scotto v. Almenas</u>, 143 F.3d 105, 114 (2d Cir. 1998). If the evidence favoring the nonmoving party is "merely colorable . . . or is not significantly probative, summary judgment may be granted." <u>Anderson</u>, 477 U.S. at 249–50, 106 S. Ct. 2505 (internal citations omitted).

## B. <u>Choice of Law</u>

"In diversity jurisdiction cases, federal courts 'must look to the choice of law rules of the forum state." <u>Deutsch v. Novartis Pharms. Corp.</u>, 723 F.Supp.2d 521 (E.D.N.Y. 2010) (citing <u>Curley v. AMR Corp.</u>, 153 F.3d 5, 12 (2d Cir. 1998)). "In New York 'the first question to resolve in determining whether to undertake a choice of law analysis is whether there is an actual conflict of laws.'" <u>Id.</u> In this case, both the Plaintiffs and the Defendant agree that New York

law applies. Thus, "no choice of law analysis is necessary" and the Court will apply New York law. Fed. Ins. Co. v. Am. Home Assur. Co., 639 F.3d 557, 566 (2d Cir. 2011) (citation omitted).

"The New York approach to the interpretation of contracts of insurance is to give effect to the intent of the parties as expressed in the clear language of the contract." Fed. Ins. Co., 639 F.3d at 567 (citation omitted). Thus, courts "give unambiguous provisions of an insurance contract their plain and ordinary meaning" and will not "disregard the plain meaning of the policy's language in order to find an ambiguity where none exists." Id. (citation and internal question marks and alterations omitted). "On the other hand, under New York law, contract claims are generally not subject to summary judgment if the resolution of a dispute turns on the meaning of an ambiguous term or phrase." Id. "However, where language in a contract is ambiguous, summary judgment can be granted if the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the language." Id. (citation and internal quotation marks omitted). "The question of whether the language of a contract is clear or ambiguous is one of law, and therefore must be decided by the court." Id. at 568 (citation and internal quotation marks omitted).

In cases involving insurance contracts, "[l]anguage . . . will be deemed ambiguous if reasonable minds could differ as to its meaning." Haber v. St. Paul Guardian Ins. Co., 137 F.3d 691, 695 (2d Cir. 1998); see also Fed. Ins. Co., 639 F.3d at 567. Moreover "in New York, when an insurer seeks to disclaim liability through an exclusion clause in the policy the insurer must prove that the insured clearly is not covered by the policy. Any ambiguities are to be resolved in favor of the insured." Broadway Nat'l Bank v. Progressive Casualty Ins. Co., 775 F. Supp. 123, 128 (S.D.N.Y. 1991) (citing Marino v. New York Telephone Co., 944 F. 2d 109 (2d Cir. 1991)); see also Hugo Boss Fashions, Inc. v. Fed. Ins. Co., 252 F.3d 608, 615 (2d Cir. 2001).

**1.  <u>As to Whether The Plaintiffs May Recover for the Additional Living Expenses</u>**

As to the Additional Living Expenses, the Plaintiffs argue that Maggio, as an agent of the Defendant, bound the Defendant with regard to his representation that the Plaintiffs need not supply the Defendant with documentation of its Additional Living Expenses.  The Defendant counters by pointing to several provisions of the Policy.

As noted above, the Policy provides for recovery of Additional Living Expenses, namely "the required increase in living expenses [the Plaintiffs] incur to maintain [their] normal standard of living." (Policy, at B3).  Also, after a loss, the Policy requires the Plaintiffs to "provide records and documents we request and permit us to make copies" as often as the Defendant "reasonably require[s]."  (<u>Id.</u>, at E1).  The Policy also mandates that the Plaintiffs provide Defendant with receipts for Additional Living Expenses within 60 days after the Defendant requests them (<u>Id.</u>).  Finally, relevant here, the Policy requires that "[a] waiver or change of a part of this policy [] be in writing by [the Defendant] to be valid." (<u>Id.</u>, at L1).

Here, the Court finds that the Policy is unambiguous in its requirement that the Plaintiffs provide documentation to the Defendant of their Additional Living Expenses only upon Defendant's request.  In the Court's view, the Plaintiffs are only entitled to undocumented Additional Living Expenses up to and including the time of such a request.  In this regard, the Plaintiffs need not rely on Maggio's oral assurances regarding maintaining receipts for Additional Living Expenses.  At the time Maggio allegedly made the oral representation to the Plaintiffs, the Plaintiffs were under no duty to document their Additional Living Expenses.  Of course, the precise date that the Defendant properly requested documentation of Additional Living Expenses remains an issue of fact.

2. **As to Whether the Plaintiffs may Recover for the Expenses Related to their Home**

In their motion papers, the Plaintiffs submit copies of checks and bills documenting construction expenses in the wake of the storm for not less than $224,746.02 (Plf's Exh K & L). The Defendant contends that Plaintiffs have failed to establish that these documented expenses were proximately incurred by damage from the storm. The Plaintiffs counter that these expenses were "necessary" and not outside the scope of the policy, but do not dispute that, absent an explicit policy declaration of the parties' intention, the proximate cause doctrine applies here.

In New York, "[t]he concept of proximate cause when applied to insurance policies is a limited one." Great N. Ins. Co. v. Dayco, 637 F. Supp. 765, 778 (S.D.N.Y. 1986). Among the factors which must be assessed are the spatial and temporal proximity between the insured peril and the claimed loss. See Cont'l Ins. Co. v. Arkwright Mut. Ins. Co., 102 F.3d 30, 36 (1st Cir. 1996) (applying New York law).

It is true, as the Defendant contends, that the documented expenses related to the home construction are not, on their face, directly attributable to the damage caused by the storm. However, in the Court's view, the Plaintiffs have established the existence of issues of fact with regard to whether these expenses to repair these damages were proximately caused by the storm rather than "upgrades" to the Plaintiffs' home not covered by the Policy. For example, as to the plumbing work, Ed Marquez, who worked for the contractor, stated "[T]hey were just, you know were like all the dust and all the dirt, they were just pretty much wrecked, yea. They weren't – you know, nothing was new. They weren't going to save it. There was no saving it." (Marquez Dep, at 45). Marquez similarly testified that the fixtures in the bathroom were unable to be replaced without breaking them and ruining them and that, in fact, these components appeared to be "wrecked" (Id. at 45, 47). That said, to the extent the Plaintiffs seek expenses related to

simply bringing their home into compliance with varying construction codes, such expenses are expressly excluded from coverage under section 1 (h) of the Policy.

As to the furniture, the Defendant maintains that the Plaintiffs failed to cooperate with the Defendant as part of its investigation of their claim. Under New York law, it is clear that "when an insured deliberately fails to cooperate with its insurer in the investigation of a covered incident as required by the policy, the insurer may disclaim coverage in the absence of a waiver by or estoppel of the insurer." 70A N.Y. Jur. 2D Insurance § 2122. "The burden of proving lack of co-operation of the insured is placed upon the insurer." Thrasher v. United States Liab. Ins. Co., 19 N.Y.2d 159, 278 N.Y.S.2d 793 (1967) (citing Insurance Law, § 167, subd. 5). The relevant standard of proof is a preponderance of the evidence. See Ashline v. Genesee Patrons Co-op Ins. Co., 224 A.D.2d 847, 638 N.Y.S.2d 217 (3d Dept 1996).

To effectively deny insurance coverage based upon lack of cooperation, an insurance carrier must demonstrate (1) that it acted diligently in seeking to bring about the insured's cooperation, (2) that the efforts employed by the carrier were reasonably calculated to obtain the insured's cooperation, and (3) that the attitude of the insured, after his cooperation was sought, was one of willful and avowed obstruction. See BaghalooWhite v. Allstate Ins. Co., 270 A.D.2d 296, 704 N.Y.S.2d 131 (2d Dept 2000). While an insurer who alleges a violation of a cooperation clause need not show that that the insured openly avowed his intent to obstruct the insurer, it is a heavy burden to show circumstances that support the inference that the insured's failure to cooperate was deliberate. See State Farm Indem. Co. v. Moore, 58 A.D.3d 429, 872 N.Y.S.2d 82 (1st Dept 2009).

Here, the Court finds that the Defendant has not, as a matter of law, satisfied that "heavy burden" – that is, proof that the Plaintiffs have not cooperated with the Defendant in connection

15

with the furniture, thereby excusing the Defendant from coverage for those items.  Indeed, although the Plaintiffs concede not having taken certain steps to repair or replace the furniture, they aver that Defendants have failed to respond to their inquiries concerning the furniture.  Thus, an issue of fact exists as to whether the Plaintiffs failed to cooperate with the Defendant's investigation of the claim.

### 3.  <u>As to Whether the Plaintiffs May Recover for the Vermin-Related Expenses</u>

The Defendant asserts that the Plaintiffs may not recover for expenses related to the vermin problem in the home.  The Defendant relies on the policy exclusion of coverage for losses caused by "birds, vermin, rodents, insects or domestic animals" (Policy, at D2).  The Plaintiffs do not dispute this plain exclusion of coverage in the Policy, but claim that the damage related to vermin resulted from the faulty workmanship performed by one of the Defendant's vendors.  However, the Plaintiffs did not interpose any cause of action for negligence and its reference to faulty workmanship in its motion papers is conclusory at best.  Thus, the Plaintiffs are barred from recovering any expenses incurred relating to the infestation of vermin in their home.

### 4.  <u>As to Whether the Plaintiffs May Recover for Bad Faith On the Part of the Defendant</u>

The Defendant argues that the Plaintiff has not stated a cause of action for bad faith separate and apart from its breach of contract claim and that, in any event, the Defendants' actions here do not rise to the level of bad faith required by the New York Court of Appeals in <u>Sukup v. State of New York</u>, 19 N.Y.2d 519, 227 N.E.2d 842, 281 N.Y.S.2d 28 (1967).  In that case, the Court of Appeals established that there is a cause of action for extra-contractual damages where an insurer refuses, in bad faith, to pay a claim of its own insured.  The Court of Appeals set forth the standard required in order to prevail on such a claim, holding, "[i]t would

require more than an arguable difference of opinion between carrier and insured over coverage to impose an extra contractual liability for legal expenses in a controversy of this kind.  It would require a showing of such bad faith in denying coverage that no reasonable carrier would, under the given facts, be able to assert it." <u>Id.</u> at 522.

There have been several cases since <u>Sukup</u> in which the courts, while acknowledging a cause of action for bad faith, found that the plaintiff was unable to meet the standard for that cause of action.

For instance, in <u>Liberty Surplus Insurance Corporation v. the Segal Company</u>, 420 F.3d 65 (2nd Cir. 2005), the Court acknowledged that an insured could recover the costs of litigation, including attorneys' fees, in a coverage dispute, but affirmed the dismissal of the Segal Company's counterclaim because it did not allege that its insurer denied its claim in bad faith.

In <u>Greenburgh Eleven Union Free School District v. National Union Fire Insurance Company of Pittsburgh, PA,</u> 304 A.D.2d 334 (1st Dept 2003), the First Department declined to reverse the lower court's findings that the plaintiff was not entitled to reimbursement for legal fees in its declaratory judgment actions against its insurers because it had not shown bad faith. The court relied on <u>Sukup</u>, reasoning that "each [insurer] had an arguable basis for their respective disclaimers." <u>Id.</u> at 337.

A few months later in <u>Wurm v. Commercial Insurance Company of Newark, New Jersey</u>, 308 A.D.2d 324 (1st Dept 2003), the First Department again declined to award attorney's fees to a plaintiff, citing <u>Sukup</u> and finding that the plaintiff failed to make the requisite "showing of such bad faith in denying coverage that no reasonable carrier would, under the given facts, be expected to assert it.  <u>Id.</u> at 330; <u>see</u> <u>also</u> <u>Mahler v. the New England Mutual Life Insurance Company</u>, 267 A.D.2d 146 (1st Dept 1999).

More recently, in <u>Bi–Economy Market, inc. v. Harleysville</u>, 10 NY3d 187, 886 N.E.2d 127, 856 N.Y.S.2d 505 (2008), the New York Court of Appeals held that the plaintiff was entitled to extra contractual consequential damages as the result of the defendant's bad faith handling of the plaintiff's claim. The court found the plaintiff was entitled to the damages for ongoing business interruption as they were reasonably contemplated by the parties prior to contracting. The court stated that the reason the insurer company should be held liable for consequential damages was "not to punish the insurer, but to give the insured its bargained for benefit." <u>Id.</u> at 195.

In the case at bar, the Plaintiffs do not adequately allege that they suffered any damages as a consequence of the Defendant's alleged bad faith refusal to pay their claims other than the damages associated with the alleged breach of the Policy. <u>See</u> <u>Royal Indem. Co. v. Salomon Smith Barney, Inc.</u>, 308 A.D.2d 349, 350 (1st Dept 2003) ("Allegations that an insurer had no good faith basis for denying coverage are redundant to a cause of action for breach of contract based on the denial of coverage, and do not give rise to an independent tort cause of action, regardless of the insertion of tort language into the pleading").

At most, the Plaintiffs allege a general disapproval of Maggio's investigation of their claim. When asked about Maggio, Mrs. Ebrahimian stated: "We were unhappy with [] Maggio . . . He just – I don't know, just was, like, we just felt that he wasn't doing the right thing with us." (Mrs. Ebrahimian Dep, at 133). She further stated that Maggio "was not being helpfully [sic] I feel. He was not being sympathetic to us. My children had felt that, you know, that he was very nice and all that originally and he just . . . I can't remember offhand, but there was, he, you know, he was just – I don't know, just didn't – something about him that just" (<u>Id.</u> at 135). Mrs. Ebrahimian also indicated: "I can't say [Maggio] misrepresented, but he was not being helpful"

(Id. at 136).  The Court finds that this general disproval does not suffice to state a cause of action for bad faith disclaimer of insurance coverage.  Accordingly, the Court dismisses with prejudice the Plaintiffs' cause of action for bad faith.

5.  **As to Whether the Plaintiffs May Recover Punitive or Special Damages**

For similar reasons, the Plaintiffs fail to state a cause of action warranting either punitive or special damages.   "[T]he standard for awarding punitive damages in first-party insurance actions is 'a strict one,' and this extraordinary remedy will be available 'only in a limited number of instances.'" Rocanova v. Equitable Life Assur. Soc. of U.S., 83 N.Y.2d 603, 613, 634 N.E.2d 940 (1994) (citations omitted).   Two leading New York cases holding that an action grounded on breach of contract cannot be characterized as an action in tort in order to recover punitive damages are Rocanova and New York Univ. v. Continental Ins. Co., 87 N.Y.2d 308, 662 N.E.2d 763 (1995).

In Rocanova, the New York Court of Appeals decided two actions in a single opinion. The plaintiffs sued their respective insurers claiming unfair settlement practices and sought punitive damages.  The Court found that the plaintiffs failed to meet the strict standard required for a showing of punitive damages in contract cases, as "where the conduct constituting, accompanying, or associated with the breach of contract is first actionable as an independent tort for which compensatory damages are ordinarily available, and is sufficiently egregious . . . to warrant the additional imposition of exemplary damages."  Rocanova, 83 N.Y.2d at 613. Further, the Court determined that the plaintiffs failed to show that the defendants' illegal conduct was part of a pattern of conduct directed at the public generally.  Id.

In New York Univ., the defendant was also an insurance company that denied the plaintiff's claim under a commercial crime insurance policy.  87 N.Y.2d at 313.  The court

declined to award punitive damages because the action was grounded on a breach of contract and the plaintiff failed to state any tort outside of the contract. Id. at 321. In arriving at this conclusion, the court stated: "Where a lawsuit has its genesis in the contractual relationship between the parties, the threshold task for a court considering defendant's motion to dismiss a cause of action for punitive damages is to identify a tort independent of the contract." Id. at 316. The court further noted that "[a] defendant may be liable in tort when it has breached a duty of reasonable care distinct from its contractual obligations, or when it has engaged in tortious conduct separate and apart from its failure to fulfill its contractual obligations." Id.

Here, as previously stated, the Plaintiffs have failed to allege an independent tort separate and apart from the alleged breach of the Policy or that the alleged conduct was of an egregious nature. Rather, this case "essentially [involves] a 'private' contract dispute over policy coverage and the processing of a claim which is unique to these parties, not conduct which affects the consuming public at large." New York Univ., 87 N.Y.2d at 321 (citation omitted). Thus, the Court denies the Plaintiffs' request for punitive damages.

Similarly, the Court denies the Plaintiff's request for special damages. "Special damages contemplate the loss of something having economic or pecuniary value" and "must be fully and accurately stated, with sufficient particularity to identify actual losses. [R]ound figures or a general allegation of a dollar amount . . . will not suffice." Thai v. Cayre Group, Ltd., 726 F. Supp. 2d 323, 330 (S.D.N.Y. 2010) (citation and internal quotation marks omitted); Nunez v. A–T Fin. Info. Inc., 957 F. Supp. 438, 441 (S.D.N.Y. 1997). "The particularity requirement is strictly applied, as courts will dismiss [] claims for failure to allege special damages with the requisite degree of specificity." Thai, F. Supp. 2d at 330. Here, the Plaintiffs make a general plea for consequential and special damages in the amount of $1,000,000.00. The Court finds that

the Plaintiff's demand for special damages has not been plead with sufficient particularity, as a matter of law.

## IV.  CONCLUSION

In sum, the Court finds that certain issues of fact exist as to the Plaintiffs' breach of contract claim, but that the Plaintiffs' claims of bad faith and for punitive and special damages fail as a matter of law.  Thus, based on the foregoing, it is

**ORDERED**, that the Defendant's motion for summary judgment dismissing the complaint is granted in part to the extent the Court dismisses with prejudice the Plaintiffs' claims for

(1) undocumented Additional Living Expenses incurred after the Defendant requested such documentation;

(2) construction-related expenses required to bring the Plaintiffs' Home to code;

(3) vermin-related expenses in the Plaintiffs' home;

(4) bad faith disclaimer of coverage;

(5) punitive and special damages; and it is further

**ORDERED,** that the Defendant's motion for summary judgment is otherwise denied.

**SO ORDERED.**
Dated: Central Islip, New York
June 10, 2013

_____*Arthur D. Spatt*_____
ARTHUR D. SPATT
United States District Judge